## No. 2254.

### MARTIN PLESS *v.* THE STATE.

1. PRACTICE—CHARGE OF THE COURT correctly omits requested instruc-
   · tions when it comprehends within itself all the law of the case.
2. ASSAULT TO RAPE—FACT CASE.—See the statement of the case for evi-
   dence *held* insufficient to support a conviction for assault to rape.
3. SAME—EVIDENCE.—No testimony should be rejected in a rape case which,
   in the remotest degree, will tend to aid the jury in reaching the truth.
   In this case the State offered a medical witness who examined the pri-
   vates of the alleged injured party, five weeks after the alleged offense,
   but, upon objection by the defendant, the evidence was rejected. *Held*,
   that, though somewhat remote in point of time, the evidence should
   have been received as tending to throw light upon the transaction.

APPEAL from the District Court of Bell. Tried below before
the Hon. W. A. Blackburn.

Under an indictment for the rape of Lena Fields, in Bell county,
Texas, on the fifth day of November, 1886, the appellant was
convicted of an assault with intent to rape, and his punishment
was assessed at a term of four years in the penitentiary.

B. J. Fields, the father of the alleged injured female, was the
first witness for the State. He testified that he was a widower,
and had two daughters, Lena, the alleged injured person, eleven
years old at the time of the outrage, and Nettie, two years old.
With his two daughters he lived on his farm in Bell county,
Texas. The defendant, at the time of this outrage, had lived at
witness's house, in his employ, more than a year. Witness paid
him by the month until cotton harvest, and then paid him ac-
cording to the amount of cotton he picked. After the cotton
crop was picked witness told him that he could make witness's
house his home until he secured other work. One morning in
November, 1886, on the eleventh, as well as witness could re-
member, defendant applied to witness for the loan of a mule
and saddle to ride to the house of his mother. Witness told
him that he could get the mule and saddle in the afternoon, but
that he must not leave the place during the forenoon, as he,
witness, had an engagement at the place of his brother-in-law,
Gus Sims, to aid in killing a beef, would have to go in the

forenoon, and would not be back until dinner, and wanted defendant to stay and look after the place and his children until his return. Defendant replied that he would observe the witness's directions. Witness then gave him directions about chores to be performed and left, going direct to Sims's house. He left no one at his home but defendant and his two daughters.

The beef was slaughtered on Sims's place, in the presence of T. B. Moore and Jim Lambert. While the animal was being reduced to beef, Moore told witness something about defendant which caused witness to return home at once. Arriving a few minutes before twelve o'clock, he found his daughter Lena crying and the defendant gone. In reply to the witness's inquiry as to the cause of her weeping, Lena said that "somebody picked her up, threw her on the bed, pulled up her clothes, took something out of his pants and stuck it into her, and threatened to tie her hands." Witness did the clothes washing for himself and family. He knew the skirt that his daughter Lena had on at the time of the alleged outrage. He examined that skirt on the morning after the alleged outrage, and found blood on that part of it which in wearing would come in contact with her private parts. He did not examine the privates of his daughter, but had two physicians to do so, about five weeks after the occurrence.

The witness ate no dinner on his return home from Sims's, but, upon being informed of the outrage, called upon several friends who, during the evening, arrested the defendant and took him to Belton. The witness did not on reaching home tell Lena that Moore had told him anything. He found Lena crying, and she told him the facts to which he has deposed. Before going to seek his friends and start the pursuit, witness sent his daughters to the house of their aunt, about a half mile distant. The witness had often before left his children alone with defendant in the day time, and sometimes witness did not get home until after night fall. Witness and his two daughters slept together in the same bed, and defendant occupied a room at the end of the gallery.

Lena Fields, the alleged injured female, was the next witness for the State. She testified, in substance, that shortly after her father left to go to Gus Sims's house, she and defendant got into play. Defendant picked her up, threw her on the bed, pulled up her clothes, took something out of his pants and inserted it into her private parts. Witness resisted and tried to escape, but was

frightened into submission by defendant's threat to tie her hands.
After he had accomplished his purpose and released her, defend-
ant told witness that if she reported him to her father he would
kill her.    While he was attempting to subject her to his passion,
and while she was resisting, and before or at the time he threat-
ened to tie her hands, defendant told the witness that if she
would not cry out he would give her a nickel.    Witness was
afraid to protest after defendant threatened to tie her hands.
She did not consent to the carnal act.    Defendant left immediately
after the perpetration of the outrage.

Cross examined, the witness stated that she did not cry before,
at the time of, nor after the outrage upon her, nor was she cry-
ing when her father reached home from Sims's.    On his arrival
witness's father asked her where the defendant was, and she told
him that defendant had taken the mule and gone to the house of
his mother.    In the the course of their play, the witness and de-
fendant ran through the house into the room in which the out-
rage took place.    On reaching the room the defendant treated
the witness in the manner described.    Witness then had on
drawers which were closed in front and open on the sides, the
sides being slit about eight inches down the legs.    Defendant
placed the witness on the bed, unbuttoned her drawers and
pulled them partially down.    He then unbuttoned his pants and
lay down beside the witness.    He then took something out of
his pants which he tried to insert into the witness's privates.    He
did not succeed in getting the thing in.    He told witness that he
would tie her if she did not behave herself; that he would tie or
kill her if she did not lie still, and would give her a nickel if she
did.    Witness did not cry out.    She had often been in the de-
fendant's room, but he had never assaulted her before.    Witness
did not consent on this occasion.    When defendant got through
with witness, having tried but failed to penetrate her person, he
caught and saddled the mule, and, as he started home, witness
asked him when he would be back.    He replied: "To-night,"
and witness told him not to come back at all.

The motion for new trial raised the questions discussed in the
opinion.

*James Boyd* and *J. D. McMahon,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Willson, Judge. We find no error in the charge of the court. but regard it as a clear and admirable exposition of the law of the case. There was no error in refusing the special instructions requested by the defendant, as the whole law applicable to the evidence had been correctly given in the general charge of the court.

We are not satisfied with the sufficiency of the evidence. We do not think the conviction is supported by it, with that strength ana conclusiveness which law and reason in such cases demand. The testimony of the alleged injured female conflicts in some particulars with that of her father, and in other respects is not free from suspicion. While she states that she did not consent to the alleged outrage upon her person, her conduct on the occasion, as detailed by herself, is somewhat inconsistent with a want of consent on her part, and rather leads to the conclusion that she was not an unwilling victim. Her testimony is but very slightly corroborated. Her father testified that he found blood upon her underclothes the next morning after the alleged outrage, but we are not informed whether these blood stains were recent or old, or whether other causes than the alleged outrage might not have produced them, No examination of the girl's private parts was made until five weeks after the alleged crime, and the evidence discloses no reason why such examination was not sooner made.

It occurs to us that if the defendant is guilty of the offense of which he has been convicted, his guilt can be established more satisfactorily than has been done. There appears to exist some sources of information which were not explored and developed on the trial. It seems that one T. M. Moore must have possessed some knowledge concerning the transaction, and yet he was not produced as a witness, and his non-production was not accounted for by the State. Again, about five weeks after the alleged crime, the person of the female was examined by two physicians with a view to ascertaining whether or not she had been outraged. When their testimony was offered by the State, the defendant objected to it, and the court sustained the objection. In this ruling we think the court erred. It is true that this testimony would be, in point of time, rather remote, but still it might throw much light upon the transaction, and in cases like this we do not think any testimony should be excluded which tends, in the least degree, to aid the jury in arriving at the

truth.   Upon another trial this testimony, if offered, should be admitted.

Because, in our opinion, the evidence is not sufficient to support the conviction, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered February 9, 1887.